# 62                CROSSMAN v. LURMAN.

GEORGE W. CROSSMAN and HERMAN SIELCKEN, Composing the Firm
of W. H. CROSSMAN & BROTHER, Appellants, v. THEODOR G.
LURMAN and BENJAMIN D. WILLIAMS, Composing the Firm of
THEODOR G. LURMAN & COMPANY, Respondents.

*Adulteration of coffee — not effected by an opaque substance which does not conceal
any defect — evidence to that effect is competent — natural coffee, when not
required.*

In an action brought to recover damages for the defendants' failure to accept
certain coffee which they contended had been colored in violation of section 41
of the Public Health Law (Laws of 1893, chap. 661), forbidding the sale of adul-
terated food and declaring food to be adulterated within the meaning of the
act, "If it be colored, or coated, or polished, or powdered, whereby damage is
concealed; or it is made to appear better than it really is, or of greater value,"
where the defendants rest after giving evidence that the coffee in question was
covered with an opaque substance, presumably oxide of iron, the plaintiff in
rebuttal may show; by the evidence of witnesses who examined the coffee, that
such substance did not, as a matter of fact, conceal any defects in the coffee —
especially where it appears that the color of coffee does not affect its value.

The defendants are not entitled to go to the jury upon the question whether the
contract required the delivery of "natural coffee" (which the court stated to
be coffee in the state in which it was grown), where it appears that the con-
tract simply provided for the delivery of a certain number of bags of coffee
to average in grade about standards numbers 8 and 9 of the Coffee Exchange
of the city of New York, and that the coffee had been ascertained, in the man-
ner provided in the contract, to be of the required grade.

APPEAL by the plaintiffs, George W. Crossman and Herman
Sielcken, composing the firm of W. H. Crossman & Brother, from a
judgment of the Supreme Court in favor of the defendants, entered
in the office of the clerk of the county of New York on the 18th
day of August, 1899, upon the verdict of a jury, and also from an
order entered in said clerk's office on the 23d day of August, 1899,
denying the plaintiff's motion for a new trial made upon the minutes.

This action was brought to recover damages for the failure of the
defendants to accept certain coffees tendered them under a contract
providing that the coffees should be of an average grade specified
therein.    The defendants pleaded that part of the goods tendered
had been so treated and changed in appearance as to come within
the prohibition of chapter 661 of the Laws of 1893, and that,
although they offered to receive such goods as were not obnoxious

to law, the plaintiffs refused to deliver either the unadulterated coffees without the adulterated coffees or to substitute unadulterated coffees for the adulterated article.

*Frederic R. Kellogg*, for the appellants.

*Charles Stewart Davison*, for the respondents.

Ingraham, J. :

On a former appeal to this court in this action (33 App. Div. 422) it was held that the only question presented was whether a sale of the coffee was prohibited by section 41 of the Public Health Law (Chap. 661, Laws of 1893). It is there provided that "No person shall within the state * * * sell, or offer for sale, any adulterated food or drug. An article shall be deemed to be adulterated within the meaning of this act * * * In the case of food * * * If it be colored, or coated, or polished, or powdered, whereby damage is concealed, or it is made to appear better than it really is, or of greater value." As was said on the former appeal, "It is plain that, under the provisions of this statute, the mere fact that an article is colored is not of itself sufficient to make the sale of it illegal. The sale of a colored article is not forbidden unless by means of the coloring, damage to the article is concealed, or the article is made to appear better than it really is, or of greater value. The intent with which the coloring is put upon the article is of no importance. The law deals solely with the effect, and it forbids the sale of the colored article only when, after the coloring shall have been put upon it, one of the effects mentioned in the law shall have been produced. Unless that has taken place the sale of the article is not illegal." It was also thus held that a ruling of the court, excluding testimony of a witness called for by the defendants, as to whether the effect of the artificial coloring of the coffee would be to enhance its value, or make it appear better that it really was, was error, and upon that ground the judgment was reversed and a new trial ordered. In discussing this particular evidence the court say : "It was assumed to be, and it undoubtedly was, essential for the defendants in establishing their case to show that the use of coloring matter upon the coffee in question was to enhance its value or make it appear better than it really was. That was

FIRST DEPARTMENT, DECEMBER TERM, 1899.          [Vol. 46.

conceded, and such evidence as applied to the particular coffee was admitted in every case where it was offered. 'The witness whose testimony was objected to and rejected was a man of considerable experience in that trade, who had dealt largely in coffee, and was familiar not only with the manner of dealing, but with the effect of coloring matter generally upon coffee to which it was applied, and it must be assumed that he was able to say what in such cases was the general effect of the application of coloring matter to the article. * * * It appears, and is uncontradicted in the case, that the coloring of coffee was not an unusual thing, but, on the contrary, that colored coffees were very largely imported into the United States and very largely dealt in for purposes of sale in certain portions of this country. The coloring of coffee, therefore, was quite familiar to dealers, and it must be assumed, as was stated, that the object of it was to improve it, either in actual value or appearance, and not to make it worse. That being so, it was clearly within the province of a dealer in coffee who was familiar with colored coffees to say whether the addition of a yellow coloring substance to the coffee bean would produce the intended effect and enhance its value. For that reason this testimony should have been admitted, and the witness should have been permitted to say what was the usual effect of such a coloring of coffee as this." Upon the trial the parties entered into a stipulation admitting the sale of the coffee, its tender to the defendants, its grading as provided for in the contract from which it appeared that the coffee was a good delivery under the contract, that "the presence, in greater or less quantity, in coffee of small sticks, black beans, hulls, broken beans, musty beans, little stones, dirt, rain-damaged beans, pale beans, swelled beans, sour beans are all taken into consideration in grading coffees, and the coffees which are to be graded and classified by the graders by comparison with the said standards or standard samples of the Exchange which under the rules of the Exchange serve as the only guide. This classification or grading takes into account the presence of all such (and any other) defects in greater or less quantity, but is irrespective of the color or style of the coffee. This reference to color or style, however, does not in anywise mean artificial color, but merely that coffee is not to be graded any higher or any lower because in natural color it is a light coffee or a dark coffee; equally

good coffees come forward to this port from different ports or plantations, some light, some dark, sometimes most of the coffees in a given year being light and at other times dark. In other words, difference in the natural color of coffee is not regarded as an element entering into grading." Upon this stipulation and proof of the contract and the refusal to accept by defendants, the plaintiffs rested. The defendant called a witness who testified that he was an analytical chemist; that he subjected some of the coffee in controversy to a chemical analysis; that upon the coffee he found a foreign substance which was a form of iron, presumably oxide of iron; that this substance was over the whole of the bean, so far as the witness could tell; that this oxide of iron is a dense opaque substance, and this substance covered the whole of the beans evenly. Upon cross-examination the witness testified that some of this substance appeared to adhere to the surface of the bean, and none appeared to be loose. There was no evidence that this oxide of iron, in the quantities it was found upon these beans, was in any way deleterious to health or that this particular coffee was damaged, or that, as a fact, this coloring matter found upon the coffee beans concealed any damage. The defendants having rested, the plaintiffs called several witnesses to rebut the inference sought to be drawn from the testimony that this coffee, covered to a greater or less extent with this opaque substance, did, as a fact, conceal damage, and endeavored by these witnesses to show as a fact the condition of the coffee that they examined. Small, a coffee dealer, and one of the licensed graders of the Coffee Exchange since its inception in 1882, and who passed upon this coffee in dispute under the contract, was asked a number of questions tending to show the effect that this coloring matter produced upon the appearance of the coffee and whether the coloring substance did prevent the witness from ascertaining the condition of the coffee. All of these questions were excluded upon objection by the defendants. Another witness was called who was a jobber and importer of coffee. He had been in business for twenty years, and during that entire time he had been familiar with coffees that had been artificially colored. He had examined the coffee in question, and was asked whether the substance that was found on these coffee beans was opaque or trans-

lucent, and was then asked a series of questions as to the effect that this coloring matter had upon this coffee and what he saw upon an examination of it. He was asked whether he could see the character of the bean and see any defect thereon, notwithstanding the yellowish substance upon the bean, which questions were excluded upon the objections of the defendants. Several other witnesses were called and asked similar questions, all of which seem to have been excluded upon objections by the defendants.

It is a little difficult to see upon what principle these rulings were made. The question is whether the coffee had been so colored or coated or polished as to conceal damage, or whether it was made to appear better than it really was or of greater value. The defendants had been allowed to prove that there was a coating of an opaque substance upon the coffee and had rested at that. The plaintiffs, in rebuttal, endeavored to prove that the coating of this substance upon the coffee bean did not, as a matter of fact, conceal any defects in the coffee, but were not permitted to do so. The witness was not asked to testify to an opinion but to what he as a fact saw in examining the coffee. Even assuming that the witness' opinion upon that subject was not competent, it certainly was competent for him to examine the coffee and to testify to the appearance of the bean with the coating upon it which had been testified to by the defendants' witnesses. This court, upon the former appeal, distinctly held that expert testimony as to the condition of the coffee was competent. The judgment rendered upon the first trial was reversed by this court upon the ground that such evidence had been excluded. It was true that on the former trial the evidence which was excluded was offered by the defendants, but the ruling that that expert testimony was competent on behalf of the defendants was not a ground for excluding expert testimony offered on the part of the plaintiffs to rebut that offered by the defendants. As was said upon the former appeal, "The coloring of coffee, therefore, was quite familiar to dealers, and it must be assumed, as was stated, that the object of it was to improve it, either in actual value or appearance, and not to make it worse. That being so, it was clearly within the province of a dealer in coffee who was familiar with colored coffees to say whether the addition of a yellow coloring substance to the coffee bean would produce the intended effect

and enhance its value. For that reason this testimony should have been admitted, and the witness should have been permitted to say what was the usual effect of such a coloring of coffee as this." We think, therefore, that under the rule laid down on the former appeal the exclusion of this evidence was error. The, effect of our former decision was that a sale of coffee under this section of the Public Health Law before cited was not illegal unless it appeared that the article so offered for sale was colored or coated so that damage as a fact was concealed, or that it was made to appear better than it really was, or of greater value. The statute prohibits an individual from selling his property in derogation of the common-law right of every one who owns property. It is a statute that is not to be extended beyond what can be fairly inferred from its terms, and the mere fact that an article of food has upon it a coloring or coating which would tend to conceal damage, if such damage existed, it not within the prohibition of the statute. It must appear not only that such a covering was placed upon the article, but that such a covering or coating did conceal damage. The language of the statute is "If it be colored or coated or polished or powdered whereby damage is concealed," not such a covering or coating as *would* conceal damage, if damage existed, but such a covering or coating as in the case of a particular article exposed for sale did conceal damage. This was the construction of the statute which was given upon the former appeal. To justify a person in refusing to accept the delivery of an article as prohibited by this statute there must be some proof that it was a damaged article, and that such damage was concealed by the covering or coating. In this case it was expressly stipulated that the color of the coffee was not an indication of its value, and that, therefore, a discoloration of a bean would not of itself be damage. It is difficult to see, therefore, how evidence merely tending to show that this coffee was colored by a substance which was in its nature opaque, without proving that the coffee itself was in some way damaged, which this covering did conceal, would bring the case within the statute.

The learned trial court seems to have submitted to the jury a question as to what was intended by the contract, and as to whether or not these plaintiffs were bound to deliver to the defendants "natural coffee;" and the court stated to the jury that he

supposed that "natural coffee" meant coffee which is in the state in which it was grown without any addition to it of any sort, adding further: "The claim is made here that under that contract the plaintiffs, before they can recover, must prove that the coffee that they offered to deliver and did tender to the defendants in this case was 'natural coffee.' And it is for you to determine what 'natural coffee' meant. It is a question of fact under this contract." To this charge of the court the plaintiff excepted. Turning to the contract it does not appear that anything was said about "natural coffee." What the plaintiffs sold and what the defendants bought was 500 pound bags of Rio coffee; such coffee to average in grade about standards numbers 8 and 9 of the Coffee Exchange of the city of New York. It was conceded that grade 9 is the lowest of the standard grades of the New York Coffee Exchange, and it certainly could not be assumed that this grade of coffee was of particular excellence, or that the defendants were bound to deliver anything more than they agreed to deliver, namely, 500 bags of Rio coffee. The parties to the contract had provided a means of ascertaining whether or not coffee tendered under this contract was of the grade required by it, and under the provisions of the contract the grade of the coffee tendered was ascertained, and it was determined that it was of the grade required by the contract. Thus, the defendants were precluded from alleging that the coffee tendered was not a good delivery under the contract. The defendants' sole defense to this demand on the part of the plaintiffs, as was clearly stated by this court upon the former appeal, was, that any sale of this coffee within this State was a violation of the provisions of the Public Health Law before referred to. The sole issue of fact to be disposed of upon the trial, therefore, was whether or not a sale of this coffee was prohibited by this provision of the Public Health Law, and that depended entirely upon whether or not the defendants were able to prove that this coffee was colored or coated or polished or powdered, whereby damage was concealed, or it was made to appear better than it really was, or of greater value. Upon that question, even assuming that the defendants had proved facts sufficient to justify a submission of the question to the jury, the evidence before referred to offered by the plaintiffs in rebuttal was clearly competent.

For the reasons above indicated I think the judgment should be reversed and a new trial ordered, with costs to the appellants to abide the event.

Van Brunt, P. J., Barrett, Rumsey and McLaughlin, JJ., concurred.

Judgment reversed, new trial ordered, costs to appellants to abide event.